UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IVOCLAR VIVADENT, INC.,

               Plaintiff,

v.                                                1:19-cv-00394 EAW

EMILY SEXTON,

               Defendant.

**IVOCLAR'S SUPPLEMENTAL MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

**HODGSON RUSS LLP**
*Attorneys for Ivoclar Vivadent, Inc.*
Rob Fluskey
Melissa N. Subjeck
Sarah N. Miller
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY  14202-4040
716.856.4000

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

Preliminary Statement.................................................................................................1

Statement of Facts.....................................................................................................3

    I.      The Parties ....................................................................................3

           A.     Ivoclar and Sexton ..........................................................3

           B.     The Argen Corporation, Inc. – Sexton's Current Employer.......................4

    II.     Sexton's Agreements with Ivoclar..................................................5

    III.   Sexton's Resignation .....................................................................6

    IV.   Sexton's Initial Contract Breaches..................................................7

    V.    Sexton's Concealed Misappropriation .............................................8

    VI.   Ivoclar's Claims ...........................................................................9

    VII.  The Temporary Restraining Order and Expedited Discovery ............10

Argument:  The Court Should Grant A Preliminary Injunction .................................10

    I.      The Preliminary Injunction Standard.................................................10

    II.     Ivoclar Will Likely Succeed on the Merits of its Claims.....................11

           A.     Sexton's Misappropriation of Ivoclar's
Confidential Information and Trade Secrets (Counts I and II).................11

               1.    The Standard on Ivoclar's DTSA Claim.......................................11

               2.    The Standard on Ivoclar's New York Trade Secrets Claim ..........12

               3.    Sexton Misappropriated Ivoclar's
Trade Secrets in Violation of the DTSA and New York Law .......12

           B.     Sexton's Breach of the Agreement (Count III)...........................14

               1.    Sexton has Breached the Agreement's Confidentiality Provisions15

               2.    Sexton has Breached the Agreement's Restrictive Covenant .......15

        a.    The Restrictive Covenant is Necessary to
Protect Ivoclar's Legitimate Business Interests..............................16

        b.    The Restrictive Covenant has
Reasonable Temporal and Geographic Limits..............................18

        c.    The Restrictive Covenant does not Impose
Undue Hardship on Sexton and is not Injurious to the Public.............19

           C.     Sexton's Breach of Her Fiduciary Duty and Duty of Loyalty (Count IV) 19

    III.   Sexton's Conduct Has Caused Irreparable Harm to Ivoclar................20

i

IV.     The Balancing of Hardships Weighs Decidedly in Ivoclar's Favor ......................22

V.      The Court Should Enjoin Sexton from Soliciting and Serving
        Her Former Ivoclar Customers Due to Her Misappropriation
        and Loyalty Breaches, Irrespective of the Restrictive Covenant ..........................23

Conclusion ....................................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    722 F.2d 988 (2d Cir. 1983)..................................................................................20

*Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*,
    300 Fed. App'x 48 (2d Cir. 2008).........................................................................14

*AUA Private Equity Partners, LLC v. Soto*,
    2018 WL 1684339 (S.D.N.Y. April 5, 2018) ..................................................11, 12

*Ayco Co., L.P. v. Frisch*,
    795 F. Supp. 2d 193 (N.D.N.Y. 2011) ..............................................................21, 22

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999)..................................................................................21

*Bus. Intelligence Servs., Inc. v. Hudson*,
    580 F. Supp. 1068 (S.D.N.Y. 1984)..........................................................14, 18, 19

*Capstone Logistics Holdings, Inc. v. Navarrete*,
    17-cv-4819(GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) ..............3, 10, 11, 13, 20, 24

*Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*,
    2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ......................................................12

*Cnty. of Nassau, N.Y. v. Leavitt*,
    524 F.3d 408 (2d Cir. 2008)..................................................................................10

*Devos Ltd. v. Record*,
    2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015) ......................................16, 19, 21, 22

*Earthbound Corp. v. MiTek USA, Inc.*,
    2016 WL 4418013 (W.D. Wash. Aug. 19, 2016) .................................................13

*Ecolab Inc. v. Paolo*,
    753 F. Supp. 1100 (E.D.N.Y. 1991) .........................................................10, 13, 21

*Fairfield Fin. Mortg. Grp., Inc. v. Luca*,
    584 F. Supp. 2d 479 (E.D.N.Y. 2008) ..................................................................19

*H.B. Fuller Co. v. Hagen*,
    363 F. Supp. 1325 (W.D.N.Y. 1973) ...................................................................15

*Hedberg v. State Farm Mutual Auto. Ins. Co.*,
    350 F.2d 924 (8th Cir. 1965) ............................................................................15

*Henry Schein, Inc. v. Cook*,
    2016 WL 3212457 (N.D. Cal. June 30, 2016) ....................................................13

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*,
    990 F. Supp. 119 (E.D.N.Y. 1997) .................................................................3, 23

*Integra Optics, Inc. v. Nash*,
    2018 WL 2244460 (N.D.N.Y. April 10, 2018) ...................................................19

*Juniper Entm't, Inc. v. Calderhead*,
    2007 WL 9723385 (E.D.N.Y. Aug. 17, 2007) ..................................................3, 23

*Lumex, Inc. v. Highsmith*,
    919 F. Supp. 624 (E.D.N.Y. 1996) ...............................................................18, 21

*N. Atlantic Instruments, Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999)......................................................................13, 20, 21

*Natsource LLC v. Paribello*,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001) ................................................................19

*NXICM Corp. v. Ross Insts.*,
    364 F.3d 471 (2d Cir. 2004)...............................................................................10

*Veramark Techs., Inc. v. Bouk*,
    10 F. Supp. 3d 395 (W.D.N.Y. 2014) (Wolford, J.) ............................................21

*W.W. Williams Co. LLC v. Reza*,
    2017 WL 5068522 (D. Nev. Sept. 20, 2017) ...................................................3, 24

*Webcraft Techs., Inc. v. McCaw*,
    674 F. Supp. 1039 (S.D.N.Y. 1987)................................................................3, 23

**State Cases**

*Advance Mag. Institute v. Minuteman Optical Corp.*,
    135 A.D.2d 889 (3d Dep't 1987)........................................................................13

*BDO Seidman v. Hirshberg*,
    93 N.Y.2d 382 (1999) ...............................................................15, 16, 17, 18

*Byrne v. Barnett*,
    268 N.Y. 199 (1935) ......................................................................................................20

*Computer Task Grp., Inc. v. Prof'l Support, Inc.*,
    88 A.D.2d 768 (4th Dep't 1982) ...................................................................................20

*Deblinger v. Sani-Pine Prod. Co., Inc.*,
    107 A.D.3d 659 (2d Dep't 2013) ...................................................................................20

*Evolution Mkts., Inc., v. Penny*,
    23 Misc. 3d 1131(A), (Sup. Ct. Westchester Cnty. 2009) .......................................16

*Gelder Med. Grp. v. Webber*,
    41 N.Y.2d 680 (1977) ..............................................................................................16, 18

*Greenwich Mills Co., Inc. v. Barrie House coffee Co., Inc.*,
    91 A.D.2d 398 (2d Dep't 1983) .....................................................................................14

*Integra Optics, Inc. v. Messina*,
    52 Misc. 3d 1210(A), (N.Y. Sup. Ct. Albany Cnty. 2016) .........................17, 18, 19

*Kallok v. Medtronic, Inc.*,
    573 N.W.2d 356 (Minn. 1998) ......................................................................................15

*Leo Silfen, Inc. v. Cream*,
    29 N.Y.2d 387 (1972) ........................................................................................3, 20, 23

*Marcone APW, LLC v. Servall Co.*,
    85 A.D.3d 1693 (4th Dep't 2011) .........................................................................14, 20, 22

*Misys Int'l Banking Sys., Inc. v. TwoFour Sys., LLC*,
    6 Misc. 3d 1004(A), (Sup. Ct. N.Y. Cnty. 2004) ........................................................21

*Reed, Roberts Assoc. v. Strauman*,
    40 N.Y.2d 303 (1976) .......................................................................................15, 16, 17

*Resetarits Constr. Corp. v. Olmsted*,
    118 A.D.3d 1454 (4th Dep't 2014) ...............................................................................14

*Spec. Simple Inc. v. Designer Pages Online LLC*,
    56 Misc. 3d 700 (Sup. Ct. N.Y. Cnty. 2017) ..............................................................12

*Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*,
    5 Misc. 3d 285 (Sup. Ct. N.Y. Cnty. 2004) ................................................................12

*Systems Associates, Inc. v. Tavolacci*,
 135 A.D.2d 704 (2d Dep't 1987) .........................................................................20

*Tour and Study v. Hepner*,
 77 A.D.2d 843 (1st Dep't 1980) .........................................................................20

*Town & Country House & Home Serv. v. Newbery*,
 3 N.Y.2d 554 (1958) ...........................................................................3, 14, 23

*W.T. Grant Co. v. Srogi*,
 52 N.Y.2d 496 (1981) ..........................................................................................22

**Federal Statutes**

18 U.S.C. § 1836(b) .....................................................................................................11

18 U.S.C. § 1836(b)(3)(A) ...........................................................................................23

18 U.S.C. § 1839(5) .....................................................................................................11

18 USCA § 1839(3) ...............................................................................................11, 13

Defend Trade Secrets Act ....................................................................................2, 3, 10

*DTSA* ....................................................................................11, 12, 13, 23, 24

**State Statutes**

Misc. 3d 1131(A) .........................................................................................................19

Misc.3d 1210(A) ....................................................................................................18, 19

**Rules**

Fed. R. Civ. P. 65(a) .....................................................................................................1

Ivoclar Vivadent, Inc. ("Ivoclar") submits this supplemental memorandum in support of its motion under Fed. R. Civ. P. 65(a) for a preliminary injunction against defendant Emily Sexton ("Sexton") and in accordance with the Court's Order of April 2, 2019 (Docket No. 17).  For clarity and for ease of reference, Ivoclar has filed with this supplemental memorandum the order to show cause, affidavits, and evidentiary materials that it previously filed in New York State Court prior to removal.

## PRELIMINARY STATEMENT

Sexton worked for Ivoclar for more than thirteen years.  From the fall of 2008 up to January 2019, she served as a Field Account Manager and as a Territory Sales Manager for Ivoclar.  In that capacity, she was responsible for promoting Ivoclar products, developing and nurturing Ivoclar's client relationships, and soliciting new business.

In consideration for her employment with Ivoclar, Sexton signed a Memorandum of Agreement (the "Agreement") in which she promised, among other things, to protect and safeguard Ivoclar's confidential information and not to use such information for non-Ivoclar purposes.  Her Agreement includes a post-employment restrictive covenant in which she agreed not to compete unfairly with Ivoclar for a period of one year after her employment ended. Sexton also signed Ivoclar's employee handbook and agreed to protect Ivoclar's confidential and trade secret information and not to share, copy, or transmit that information to other computers or networks.

Sexton recently accepted employment with Ivoclar's direct competitor, Argen. Sexton is now soliciting and servicing customers, on Argen's behalf, in the very territory that she served for Ivoclar, in violation of her Agreement.  Moreover, in the weeks leading up to her resignation from Ivoclar, Sexton accessed Ivoclar's password-protected customer relations system and forwarded to personal gmail account numerous Ivoclar documents that contain

Ivoclar's confidential and trade secret information, including customer account lists and contact information, Ivoclar's internal customer classification information, confidential pricing information, and other customer intelligence data.  There was no legitimate business purpose for this conduct.  Before filing this case, Ivoclar wrote to Sexton and asked her to return all of Ivoclar's confidential information.  But she ignored that correspondence.  And the evidence indicates that Sexton is now poised to use Ivoclar's confidential and trade secret information to compete unfairly against Ivoclar.

By soliciting and serving, on Argen behalf's behalf, the very customers that she served for Ivoclar, Sexton has breached the restrictive covenant in her Agreement.  By improperly accessing and forwarding Ivoclar's trade secret information to her personal email account, Sexton violated the confidentiality provision of her Agreement and the employee handbook, the Defend Trade Secrets Act, and New York trade secrets law.  She also breached her common law duty of loyalty.

Ivoclar pursues this motion for a preliminary injunction to prevent any further misuse of its confidential information and to prevent Sexton from competing unfairly with Ivoclar.  Ivoclar seeks an Order from the Court that, among other things, precludes Sexton from disclosing or using Ivoclar's confidential and trade secret information and restrains Sexton from soliciting or serving her former Ivoclar customers on Argen's behalf.

The Court should grant Ivoclar's request for relief for at least two independent reasons:  (1) the relief is necessary to enforce the restrictive covenant in Sexton's Agreement; and (2) the relief is necessary to protect Ivoclar from Sexton's violations of federal and State trade secrets law and from her breach of duty of loyalty.  Sexton's actual misappropriation—and the threat of further misappropriation—entitles Ivoclar to this relief, separate and apart from

Sexton's restrictive covenant.  This is so under State decisional law.  *See, e.g.*, *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1047-48 (S.D.N.Y. 1987); *Town & Country House & Home Serv. v. Newbery*, 3 N.Y.2d 554, 560 (1958); *Juniper Entm't, Inc. v. Calderhead*, 2007 WL 9723385 at *26, *40 (E.D.N.Y. Aug. 17, 2007); *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 137 (E.D.N.Y. 1997); *Leo Silfen, Inc.*, 29 N.Y.2d at 391-92.  It is also true under the Defend Trade Secrets Act.  *See, e.g.*, *Capstone Logistics Holdings, Inc.*, 2018 WL 6786338, at *30; *W.W. Williams Co. LLC v. Reza*, 2017 WL 5068522 (D. Nev. Sept. 20, 2017).  *See infra* at pages 23-24 for a further discussion of this case law.

## STATEMENT OF FACTS

### I.   The Parties

#### A.   Ivoclar and Sexton

Ivoclar is a leading developer, manufacturer, and supplier of a comprehensive portfolio of innovative products and systems for the dental industry.  Ivoclar makes, sells, and distributes its dental products, including professional laboratory products, such as ceramic restorations, dental alloys, and removable denture prosthetics, for customers throughout the United States and Canada.  *See* Evans Aff., ¶ 2; Stack Aff., ¶¶ 2, 3, 10.

Sexton is a former Ivoclar employee.  Sexton began her employment with Ivoclar on May 25, 2005 as a Marketing Associate for Ivoclar's Technical Products line.  Before joining Ivoclar, Sexton had no marketing or sales experience in the dental industry.  *See* Evans Aff., ¶ 4.  Sexton worked out of Ivoclar's North American headquarters in Buffalo, New York as a Marketing Associate, and then as an Associate Marketing Manager from May 25, 2005 up to early November 2008.  *See id.*, ¶ 9.

In November 2008, Sexton applied for and accepted a position as a Field Account Manager for the Ivoclar sales territory that encompassed Minnesota, North Dakota, South

Dakota, Nebraska, Iowa, and the western portion of Wisconsin.  Sexton moved to Minnesota upon accepting this position.  *See* Evans Aff., ¶ 11.  Sexton worked as a Field Account Manager from November 2, 2008 through January 1, 2016, and then as a Territory Sales Manager (also a sales representative position) from January 1, 2016 through January 31, 2019.  *See id.*; Stack Aff., ¶ 9.  As a Territory Sales Manager and Field Account Manager, Sexton's primary objective was to service existing Ivoclar customers and generate new Ivoclar customers within her designated sales territory for Ivoclar's Laboratory Product Portfolio.  *See* Stack Aff., ¶ 10.

As Sexton climbed the ranks from an entry-level employee in Ivoclar's marketing department to a Territory Sales Manager, Sexton received extensive training on Ivoclar's dental product portfolios and Ivoclar's marketing and sales strategies.  Stack Aff., ¶¶ 13-15.  Sexton also received up-to-date intelligence on Ivoclar's customers and innovations.  This included product research, development, and manufacturing processes and procedures, business activities and procedures, sales strategies, pricing information, and customer lists and contacts, customer sales histories, target customers, services and suppliers, and information developed and prepared specifically for individual Ivoclar customers located in her territory.  *Id.*, ¶¶ 14-16.

Subject to her confidentiality obligations, Sexton was permitted access to Ivoclar's password protected project management and customer relations software (SAP) system, which contains business, marketing, sales, and customer intelligence information.  Ivoclar's SAP System can be used to generate customer-specific reports, containing detailed information such as the customer's purchased products, purchased quantities, total sales, and customer-specific pricing.  Stack Aff., ¶¶ 17-19.

B.   **The Argen Corporation, Inc. – Sexton's Current Employer**

Argen is a direct competitor of Ivoclar.  Like Ivoclar, Argen is a developer and supplier of dental products, and promotes itself as the largest manufacturer of dental alloys in the

world.  Argen markets, sells, and distributes its dental products throughout the world, including in the United States.  Stack Aff., ¶¶ 23-24.

Argen recently hired Sexton.  She works for Argen in a sales position that is virtually identical to the position that she previously held for Ivoclar.  *See* Stack Aff., ¶¶ 22-23, 28; Evans Aff., ¶¶ 15, 22.

## II.  Sexton's Agreements with Ivoclar

In consideration for her employment with Ivoclar, and as a condition to her employment, Sexton signed the Agreement with Ivoclar under which she agreed to safeguard the company's confidential information and to refrain from unfairly competing with the company after her employment ended.  *See* Evans Aff., ¶¶ 5-6, Ex. 1.

Specifically, Sexton agreed not to disclose, use, or otherwise disseminate any Ivoclar confidential information, including but not limited to, "research, development, manufacturing processes and procedures, patterns and business activities, procedures, customer lists, results of operation, or other affairs" of Ivoclar.  Evans Aff., Ex. 1 (Agreement) ¶¶ 3 & 4. Sexton further agreed not to "aid, abet, or assist any person or company in using any such trade secrets or confidential information."  *Id*., Ex. 1 (Agreement) ¶ 4.

Sexton acknowledged that Ivoclar's trade secrets and confidential information were solely the property of Ivoclar and that, upon her termination of employment, would not take with her, keep in her possession, or make or retain copies of any such information.  *Id*., Ex. 1 (Agreement) ¶ 9.

Sexton's Agreement also contains a reasonable and necessary post-employment restrictive covenant that prohibits Sexton from competing in certain ways against Ivoclar for a period of one year after her employment ends:

> For a period of one year following termination of my employment with the Company, I will not accept employment or otherwise engage in any business involving work by me or others under my direction and supervision, in any field directly or indirectly related to the use of information proprietary to the Company which proprietary information I have gained or had access to while an employee of the Company.

Evans Aff., Ex. 1, at ¶ 5.

Sexton also received, read, and signed Ivoclar's Employee Handbook, which prohibits the improper use or disclosure of Ivoclar's confidential information.  Evans Aff., ¶¶ 13-14, Exs. 2-3.  Under the Employee Handbook, Sexton acknowledged that she had access to highly-confidential company information.  She agreed to protect that information, and not to share, copy, or transmit that information to other computers or networks:

> Information contained in company files is considered to be confidential.  ***No data is to be shared with, copied, loaded, transmitted to, or transferred to any other computer, network or server without authorization.***  Additionally, employees are responsible for the security of and proper use of any data that they store on, or allow to be stored on, a removable media device.  It is the responsibility of every employee to report any security violation or suspicious incident immediately to the local IT helpdesk.

Evans Aff., Ex. 2 (emphasis added).  The Ivoclar Employee Handbook that Sexton received, read, and signed further provides that Ivoclar "business and trade secrets must be protected and handled confidentially."  *Id.*, Ex. 2.  Sexton understood that any misuse or disclosure of Ivoclar's trade secrets or confidential information would subject her to "disciplinary action, up to and including termination of employment or legal action, even if [she did] not actually benefit from the disclosed information."  *Id*.

## III.   Sexton's Resignation

Sexton provided Ivoclar with notice of her resignation on January 25, 2019.  Evans Aff., ¶ 15.  Sexton informed Ivoclar that she had accepted employment with Argen.  Ivoclar

- 6 -

reminded Sexton of her restrictive covenant and continuing obligations under her Agreement. But Sexton had no response to those admonitions.  *Id.*

Prior to Sexton's departure, Ivoclar asked Sexton to return all Ivoclar information, documents, and property in her possession.  Sexton initially returned only her phone, company-issued laptop, employee badge, inventory, training materials, and some literature. Evans Aff., ¶ 16.  But three weeks later, Sexton informed Ivoclar that she also had sixteen boxes of Ivoclar materials in her garage, and asked that Ivoclar make arrangements for their return. Ivoclar promptly arranged for their return.  *Id.*, ¶ 17.

## IV.    Sexton's Initial Contract Breaches

Despite Ivoclar's reminder to Sexton of her restrictive covenant, Sexton began to work for Argen.  Sexton's work and responsibilities for Argen are substantially similar, if not identical, to her work and responsibilities for Ivoclar as Territory Sales Manager.  In addition, it is Ivoclar's understanding that Sexton has been assigned to work for and generate sales from customers located in the same territory where she previously worked for Ivoclar, including customers that she serviced on behalf of Ivoclar.  *See* Evans Aff., ¶¶ 15, 22; Stack Aff., ¶¶ 20, 22-25, 28.  Accordingly, Sexton's work with Argen—which consists of client development and customer sales of dental products, and more specifically, laboratory products—is in direct violation of her restrictive covenant with Ivoclar.

After learning of Sexton's employment at Argen, Ivoclar asked Sexton to comply with her contractual obligations, and that she: (1) return all Ivoclar confidential information of any kind; (2) provide a sworn statement attesting that she delivered or returned to Ivoclar all such confidential information; and (3) cease her employment at Argen for one year.  Subjeck Aff., Ex. 2.  Ivoclar requested a response to its letter by March 4, 2019.  Sexton ignored the letter.  *Id.*, ¶ 7.

Ivoclar also sent a letter to Argen providing written notification of Sexton's continuing duties to Ivoclar, advising Argen of Sexton's continuing obligations not to use or disclose Ivoclar's confidential information and trade secrets, and formally demanding that Argen cease and desist from continuing to induce Sexton's breaches. *Id.*, ¶ 3.

## V.      Sexton's Concealed Misappropriation

While Sexton ignored Ivoclar's correspondence, Ivoclar initiated an investigation into Sexton's use of her Ivoclar email account.  Ivoclar discovered that, on the very day that Sexton gave notice of her resignation, she forwarded from her Ivoclar email account to her personal gmail account certain reports that contain Ivoclar's confidential, trade secret information.  *See* Stack Aff., ¶ 21; Evans Aff., ¶¶ 19-20.  These reports show Ivoclar's sales within Sexton's territory, broken down by product category.  They provide highly valuable, confidential, and proprietary Ivoclar information and insight on growth potential for her territory, as well as customer-specific intelligence that can be used to specifically target Ivoclar's customers.  Some of the information dated back to 2010.  *See* Stack Aff., ¶ 21; Evans Aff., ¶ 20.

After Ivoclar filed this case, on April 1, 2019, Ivoclar uncovered additional troubling information regarding Sexton's conduct in the weeks leading up to her resignation.  On December 22, 2018 at 6:44 PM, Sexton forwarded Ivoclar's confidential, updated pricing information from her Ivoclar email account to her personal gmail account.  *See* Supp. Stack Dec., ¶ 5, Ex. A.  Also attached to Sexton's email is a list of Ivoclar's top 500 technical customers nationwide, with contact information for each customer.  *See id.*  This highly confidential customer list is not limited to Sexton's territory.  *See id.*

On December 28, 2018 at 11:26 AM, Sexton forwarded an account list from her Ivoclar email account to her personal gmail account, which includes Ivoclar's customer names,

contact information for each customer, and the customer's physical and email addresses.  *See id.*, ¶ 6, Ex. B.  The account list includes Ivoclar's "classification" for each customer, which is an internal Ivoclar ranking.  It also includes information identifying Ivoclar's "last visit" with the customer and which Ivoclar employee conducted the visit.  *See id.*  The account list was generated from Ivoclar's password-protected customer relations management software (SAP) system.  *See id.*  On December 28, 2018 at 11:29 AM, Sexton forwarded a similar Ivoclar account list from her Ivoclar email account to her personal gmail account.  *See id.*, ¶ 7, Ex. C. The account list includes all the same information as the earlier report, except that Sexton generated this second list to include the customer's email account information.  *See id.*

On November 5, 2018 at 2:08 PM, Sexton forwarded a report entitled "Jan-Oct 2018 customer details" from her Ivoclar email account to her personal gmail account.  This report contains confidential customer information, including detailed sales information broken down by product type.  The report was generated from Ivoclar's password-protected SAP system.  *See id.* ¶ 8, Ex. D.

No legitimate Ivoclar business purpose existed for Sexton to forward this data to herself.  *See* Stack Aff., ¶¶ 18-21, 26-27; Supp. Stack Dec., ¶ 9.  Sexton did not return or disclose this information (or the emails in her personal account) to Ivoclar in response to their numerous requests.  *See* Evans Aff., ¶ 21.

**VI.**    **Ivoclar's Claims**

On March 18, 2019, Ivoclar filed this lawsuit in New York State Court against Sexton and Argen in order to restrain their continuing violations of Sexton's Agreement, and to seek redress for the damages caused by their conduct.  Argen removed the case to this Court on March 25, 2019.  *See* Docket No. 1.  Ivoclar filed a First Amended Complaint against Sexton

(dropping Argen from this case/venue) on April 10, 2019.  In its First Amended Complaint,

Ivoclar asserts claims for violations of the Defend Trade Secrets Act (Count I), violations of

State trade secrets law (Count II), breach of the Agreement (Count III), breach of duty of

loyalty/fiduciary duty (Count IV), and unfair competition (Count V).

## VII.    The Temporary Restraining Order and Expedited Discovery

On April 2, 2019, the Court granted, in part, Ivoclar's application for a temporary

restraining order and enjoined Sexton from using or disclosing Ivoclar's confidential or

proprietary information.  *See* Docket No. 17.  The Court also granted the parties' request for

expedited discovery, which is now underway.  *See id.*

## ARGUMENT:  The Court Should Grant A Preliminary Injunction

## I.    The Preliminary Injunction Standard

To obtain a preliminary injunction, the party seeking the injunction must show (1)

irreparable harm in the absence of the injunction, and (2) either a likelihood of success on the

merits or sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly in the movant's favor.  *See NXICM Corp.*

*v. Ross Insts.*, 364 F.3d 471, 476 (2d Cir. 2004); *Cnty. of Nassau, N.Y. v. Leavitt*, 524 F.3d 408,

414 (2d Cir. 2008).

To prevail on this motion, Ivoclar need not show that success is an absolute

certainty, but only "that the probability of [its] prevailing is better than fifty percent."  *Capstone*

*Logistics Holdings, Inc. v. Navarrete*, 17-cv-4819(GBD), 2018 WL 6786338, at *20 (S.D.N.Y.

Oct. 25, 2018) (quoting *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1109-10 (E.D.N.Y. 1991)).

## II.     Ivoclar Will Likely Succeed on the Merits of its Claims

### A.     Sexton's Misappropriation of Ivoclar's
   ### Confidential Information and Trade Secrets (Counts I and II)

Ivoclar is likely to succeed on its claims against Sexton under the Defend Trade

Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*. (the "DTSA"), and New York trade secret

misappropriation law.

### 1.     *The Standard on Ivoclar's DTSA Claim*

"The DTSA forbids misappropriation of trade secrets."  *Capstone Logistics*

*Holdings, Inc.*, 2018 WL 6786338, at *30; 18 U.S.C. § 1836(b) ("An owner of a trade secret that

is misappropriated may bring a civil action under this subsection . . . .").  A "trade secret" under

the DTSA is broadly defined to include "all forms and types of financial, business . . .

information" that "derives independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable through proper means by, another person

who can obtain economic value from the disclosure or use of the information" and that the owner

of which took reasonable measures to keep secret.  18 USCA § 1839(3).  "Misappropriation" is

defined as:

> (A) the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; **or**
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret [or] (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret."  18 U.S.C. § 1839(5) (emphasis added).

The DTSA thus "contemplates three theories of liability:  (1) acquisition, (2) disclosure, or (3)

use."  *AUA Private Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *4 (S.D.N.Y. April 5,

2018) (quoting *Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017)).  "Disclosure or use is not a required element of misappropriation, but rather an alternate basis for liability under the Act."  *Id.* at *4.

> **2.**      ***The Standard on Ivoclar's New York Trade Secrets Claim***

Under New York law, "[t]o establish a claim for misappropriation of trade secrets, a plaintiff must show (1) that it possesses a trade secret, and (2) that defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 297 (Sup. Ct. N.Y. Cnty. 2004).  New York courts have adopted the trade secret definition set forth in the Restatement of Torts § 757, Comment B, as 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"  *Id.* at 297; *Spec. Simple Inc. v. Designer Pages Online LLC*, 56 Misc. 3d 700, 712 (Sup. Ct. N.Y. Cnty. 2017)

> **3.**      ***Sexton Misappropriated Ivoclar's***
> ***Trade Secrets in Violation of the DTSA and New York Law***

As discussed in the Facts Section and in the accompanying affidavits, on the day of and weeks leading up to her resignation, Sexton transferred Ivoclar's trade secret and confidential information to her personal email account, including documents that contain Ivoclar's current pricing information for its technical product line, a list of Ivoclar's top 500 technical customers nationwide with detailed contact information for each, Ivoclar's customer classification and ranking information, and other customer intelligence and detailed sales information generated from Ivoclar's password-protected customer relations software system. There was no legitimate Ivoclar business purpose for Sexton to transfer this information.  Sexton is now poised to use Ivoclar's trade secret, confidential, and proprietary information to compete

against it.[1]   Sexton's conduct constitutes "misappropriation" under the DTSA and under New York law.

The Ivoclar information that Sexton misappropriated is precisely the kind of information subject to trade secret protection under the DTSA.  *See* 18 USCA § 1839(3) (defining "trade secret" to include "financial, business . . . information"); *Capstone Logistics Holdings, Inc.*, 2018 WL 6786338, at *32 (plaintiff's trade secret information included unique customer pricing information, customer sites, pricing structures and their duration, negotiated rebates, and "the years of data [plaintiff] has compiled or acquired about the industry, and other strategic information relating to [plaintiff's] business practices, projections and finances"); *Henry Schein, Inc. v. Cook*, 2016 WL 3212457, at *3 (N.D. Cal. June 30, 2016) (finding "[c]ustomer information such as sales history and customer needs and preferences constitute trade secrets" and granting temporary restraining order where defendant transferred a broad range of confidential information to her computer prior to resignation); *Earthbound Corp. v. MiTek USA, Inc.*, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016) ("detailed information about . . . current and prospective customers, pending projects, bid, pricing, product design, and other elements of its business constitute trade secrets" under DTSA).

Ivoclar's information is also entitled to trade secret status under New York law. "[W]here . . . it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply."  *N. Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999) (citing cases).  "Client information, such as data on the

---

[1]     Ivoclar has also established a likelihood of success on its unfair competition claim (Count V).  "[A]n employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition."  *Advance Mag. Institute v. Minuteman Optical Corp.*, 135 A.D.2d 889, 891 (3d Dep't 1987); *Ecolab, Inc. v. Paolo*, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991).

types of [products] ordered by specific clients, lists of products sold to clients but not yet

developed and problems arising in the course of client relations, are . . . protectable as a trade

secret." *Bus Intelligence Servs., Inc.*, 580 F. Supp. at 1072 (citing *Greenwich Mills Co., Inc. v.*

*Barrie House coffee Co., Inc.*, 91 A.D.2d 398, 405 (2d Dep't 1983); *Town & Country House &*

*Home Serv., Inc. v. Newberry*, 3 N.Y.2d 554, 559 (1958) (information concerning an employer's

customers held to be a trade secret because customers had to be screened from many potential

customers)); *Marcone APW, LLC v. Servall Co.*, 85 A.D.3d 1693, 1695 (4th Dep't 2011).

Ivoclar has created its confidential customer intelligence and other trade secret

information through considerable effort over several years.  *See* Stack Aff. ¶¶ 13, 16-19.  The

information Sexton misappropriated is password protected on Ivoclar's network, and its access is

restricted to those with a "need to know" at Ivoclar.  *See* Evans Aff. ¶¶ 6, 14 and Exs. 1-3; Stack

Aff. ¶¶ 16-19; Supp. Stack Dec. ¶¶ 5-8.  Ivoclar's customer intelligence information provides a

significant competitive advantage in the soliciting, developing, and maintenance of Ivoclar's

customer relationships, and facilitates Ivoclar's sales and marketing operations.  *See* Stack Aff.,

¶¶ 17-18, 21, 26.  Ivoclar's confidential information can be used by a competitor to target and

solicit its customers, undercut Ivoclar's pricing proposals, and determine Ivoclar's effective

bundling strategies that are based on longstanding customer-specific data.  *See id.*

### B.    Sexton's Breach of the Agreement (Count III)

A claim for breach of contract requires: (1) the existence of an agreement;

(2) adequate performance of the contract by the plaintiff; (3) breach of the contract; and

(4) damages.  *See Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 Fed. App'x 48, 49

(2d Cir. 2008); *Resetarits Constr. Corp. v. Olmsted*, 118 A.D.3d 1454, 1455 (4th Dep't 2014)

(quotations and citation omitted)).

1.      ***Sexton has Breached the Agreement's Confidentiality Provisions***

Under the Agreement and Ivoclar's employee handbook, Sexton agreed to safeguard Ivoclar's confidential information and not to disclose, distribute, or use any Ivoclar confidential information for any non-Ivoclar purpose.  Sexton further agreed not to share, copy, or transmit any Ivoclar data to any server, computer, or network.  *See* Fact Section II, *supra*. New York law recognizes that non-disclosure agreements are enforceable to prevent the disclosure or use of a company's confidential customer information.  *See Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 308 (1976); *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 389 (1999).

Sexton willfully violated her obligations under the Agreement and the employee handbook when she transferred Ivoclar's confidential information to her personal email account on numerous occasions shortly before her resignation from Ivoclar and on the very day she notified Ivoclar of her resignation.  *See* Fact Sections IV and V, *supra*.  There was ***no*** legitimate business purpose for Sexton's actions.  The only logical explanation is that Sexton absconded with Ivoclar's confidential information for the purpose of using it to compete unfairly against Ivoclar.  This is particularly clear in light of her decision to ignore Ivoclar's letter asking for the return of all Ivoclar information.

2.      ***Sexton has Breached the Agreement's Restrictive Covenant*** [2]

Paragraph 5 of the Agreement prohibits Sexton, for a period of one year, from accepting employment in a field related to the use of Ivoclar proprietary information:

---

[2]      New York law applies because it has the most significant relationship to this dispute. Ivoclar is headquartered in New York, the Agreement was executed in New York, Sexton worked for Ivoclar for more than thirteen years, and Sexton's conduct caused harm to Ivoclar in New York.  In any event, the law governing the enforceability of restrictive covenants is similar under New York and Minnesota law.  *See, e.g.*, *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356 (Minn. 1998); *H.B. Fuller Co. v. Hagen*, 363 F. Supp. 1325, 1331-32 (W.D.N.Y. 1973) (citing *Hedberg v. State Farm Mutual Auto. Ins. Co.*, 350 F.2d 924, 931 (8th Cir. 1965)).

> For a period of one year following termination of my employment with the Company, I will not accept employment or otherwise engage in any business involving work by me or others under my direction and supervision, in any field directly or indirectly related to the use of information proprietary to the Company which proprietary information I have gained or had access to while an employee of the Company.

Evans Aff., Ex. 1 at ¶ 5.

Sexton is currently working for Argen in a sales capacity, and she is marketing and selling competitive products in the same territory that she covered for Ivoclar. *See* Evans Aff. ¶ 22; Stack Aff. ¶ 28. She is unquestionably in breach of Paragraph 5 of the Agreement.

### a.   The Restrictive Covenant is Necessary to Protect Ivoclar's Legitimate Business Interests

Agreements restricting a former employee's ability to compete are permissible in order to protect the employer from unfair competition from its former employee. Recognizing the legitimate and protectable interests employers have in such agreements, the Court of Appeals has held that:

> The modern, prevailing common-law standard of reasonableness for employee agreements not to compete applies a three-pronged test. A restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *BDO Seidman*, 93 N.Y.2d at 389-90.

A restrictive covenant's "reasonableness must be measured by the circumstances and context in which enforcement is sought." *Gelder Med. Grp. v. Webber,* 41 N.Y.2d 680, 684 (1977).

"[R]estrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information." *Reed, Roberts Assocs., Inc.*, 40 N.Y.2d at 308; *see Devos Ltd. v. Record*, 2015 WL 9593616, at *12 (E.D.N.Y. Dec. 24, 2015); *Evolution Mkts., Inc., v. Penny*, 23 Misc. 3d 1131(A), at *38 (Sup. Ct. Westchester Cnty.

2009). A legitimate interest also exists where the employer seeks to prevent former employees "from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense." *BDO Seidman*, 93 N.Y.2d at 392; *Reed, Roberts Assoc.*, 40 N.Y.2d at 308 ("[C]ourts must also recognize the legitimate interest an employer has in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy.").

Ivoclar's goodwill with customers belongs to Ivoclar, not to Sexton or Argen. *See BDO Seidman*, 93 N.Y.2d at 391-92, 690 N.Y.S.2d at 858-59 (goodwill of a client belongs to the employer where, through employer's efforts and expenditures, employee worked closely or over a long period of time with client). Sexton's restrictive covenant is necessary to prevent her disclosure and use of Ivoclar's customer-specific intelligence, pricing information, and confidential information. *See* Stack Aff. ¶¶, 13-21, 26; Supp. Stack Dec., ¶¶ 5-9. The restrictive covenant is further necessary to enjoin Sexton from exploiting and appropriating the goodwill of Ivoclar's customers and prospective customers, which has been created and maintained solely by Ivoclar through significant investments. *See* Stack Aff., ¶¶ 13-21, 26. *See also Integra Optics, Inc. v. Messina*, 52 Misc. 3d 1210(A), at *3 (N.Y. Sup. Ct. Albany Cnty. 2016) (addressing a similar restrictive covenant to Sexton's and noting that "[a]rmed with [plaintiff's proprietary, sales-related information], a direct competitor [such as the corporate defendant] would be in a position to compete unfairly against [plaintiff] for sales.").

Even if Sexton had not stolen Ivoclar's confidential information, Sexton, a longstanding member of Ivoclar's sales team, would undoubtedly recall and use the proprietary sales and customer-related information that Ivoclar entrusted to her during her employment. Improper use of confidential information is inevitable. By virtue of working for Ivoclar's direct

competitor (Argen) within the same geographic sales territory, Sexton is positioned to use

Ivoclar's confidential customer information (and customer goodwill) to pitch Ivoclar's customers

in an attempt to steal its business. *See Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 632, 636

(E.D.N.Y. 1996) (enforcing restrictive covenant and preliminarily enjoining defendant from

working on new employer's competitive products for six months, in part to prevent defendant's

inevitable disclosure of plaintiff's confidential and trade secret information to new employer).

  **b. The Restrictive Covenant has**
    **Reasonable Temporal and Geographic Limits**

    Whether a restrictive covenant's geographic and durational limits are reasonable

must be measured by the circumstances and context in which enforcement is sought. *Gelder*

*Med. Grp.*, 41 N.Y.2d at 684. The one year duration of Sexton's restrictive covenant is

reasonable. *See Messina*, 52 Misc.3d 1210(A), at *3 (restrictive covenants with one year in

duration are within "prevailing notions of reasonableness."); *Bus. Intelligence Servs., Inc. v.*

*Hudson*, 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984) (same); *BDO Seidman*, 93 N.Y.2d at 393

(eighteen-month duration reasonable).

    While not expressly limited in geographic scope, Sexton's restrictive covenant is

reasonable, given that Ivoclar sells and markets its products in a worldwide market that is

well-defined and narrow, both in terms of products sold and customers. *See* Stack Aff. ¶¶ 2-3,

10, 13, 23. Ivoclar's competitors, including Argen, operate in the same worldwide market, and

offer products that compete directly with Ivoclar's. *See id.* ¶¶ 23-24.

    The nature of Sexton's sales efforts, coupled with Ivoclar's worldwide presence in

a narrow industry and the restrictive covenant's brief duration, renders the geographic scope both

reasonable and necessary to protect Ivoclar's business interests. *See, e.g., Messina*, 52 Misc. 3d

1210(A), at *3 (finding the absence of a geographic limitation reasonable where the plaintiff

operated in a narrow and well-defined market, the market's scope was worldwide, and the employee conducted his sales via email and telephone); *Integra Optics, Inc. v. Nash*, 2018 WL 2244460, at *7 (N.D.N.Y. April 10, 2018) (noting that "worldwide restrictions are not unusual under New York law where, as here, they are warranted by the employer's business."); *Devos Ltd.*, 2015 WL 9593616, at *13, *14 (upholding an expansive geographical limitation on an employee's ability to compete with his former employer "in light of the national reach" of the employer's business operations); *Bus. Intelligence Servs., Inc.*, 580 F. Supp. at 1072-73 (holding "the worldwide scope of the noncompetition clause not unreasonable, given the international nature of [the plaintiff's] business" and the reasonable durational scope); *Evolution Markets, Inc.*, 23 Misc. 3d 1131(A), at *14.  In addition, the restrictive covenant is reasonable because it is limited to protecting Ivoclar from Sexton's improper use of its confidential information.

### c. The Restrictive Covenant does not Impose Undue Hardship on Sexton and is not Injurious to the Public

Enforcement of the Agreement will not impose undue hardship on Sexton.  *See Messina*, 52 Misc.3d 1210(A), at * 3-*4; *Bus. Intelligence Servs., Inc.*, 580 F. Supp. at 1070 *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 472 (S.D.N.Y. 2001).  Sexton is free to work as a sales representative.  She just may not work for a direct Ivoclar competitor in the same territory she covered for Ivoclar, while soliciting and calling on the clients that she formerly served for Ivoclar.  Enforcement of the Agreement would not be injurious to the public.  Irrespective of Sexton's restrictive covenant, customers can still obtain the products they desire from other sources, including through Ivoclar and Argen.

### C. Sexton's Breach of Her Fiduciary Duty and Duty of Loyalty (Count IV)

"New York law establishes that an employee-employer relationship is fiduciary." *Fairfield Fin. Mortg. Grp., Inc. v. Luca*, 584 F. Supp. 2d 479, 485 (E.D.N.Y. 2008).  To establish

breach of fiduciary duty, a plaintiff must demonstrate "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."  *Deblinger v. Sani-Pine Prod. Co., Inc.*, 107 A.D.3d 659, 660 (2d Dep't 2013).  Indeed, "[t]here is an implicit duty upon an employee not to use confidential knowledge acquired in his employment in competition with his principal, even after the employment is terminated."  *Computer Task Grp., Inc. v. Prof'l Support, Inc.*, 88 A.D.2d 768, 769 (4th Dep't 1982); *North Atl. Instr., Inc. v. Haber*, 188 F.3d. 38, 47-49 (2d Cir. 1999); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d Cir. 1983); *Byrne v. Barnett*, 268 N.Y. 199, 206 (1935).

Any actual or threatened violation of this duty warrants injunctive relief.  *See North Atl. Instr., Inc.*, 188 F.3d. at 49; *Capstone Logistics Holdings, Inc.*, 2018 WL 6786338, at *33; *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 391-92 (1972); *see also Marcone*, 85 A.D.3d at 1696 ("[E]ven assuming, arguendo, that the misappropriated information is not entitled to trade secret protection, . . . injunctive relief is warranted on the alternative ground of breach of trust . . . in misappropriating plaintiff's proprietary information."); *Tour and Study v. Hepner*, 77 A.D.2d 843, 843 (1st Dep't 1980) (enjoining former employees from soliciting plaintiff's customers for a two-year period where the employees copied and utilized plaintiff's business records to compete with plaintiff); *Systems Associates, Inc. v. Tavolacci,* 135 A.D.2d 704 (2d Dep't 1987).

Sexton has an ongoing duty to safeguard Ivoclar's confidential and trade secret information.  Sexton breached her duty by misappropriating Ivoclar's confidential, customer-specific information.

### III.  <u>Sexton's Conduct Has Caused Irreparable Harm to Ivoclar</u>

Irreparable harm is established "where, but for the grant of equitable relief, there is a substantial chance that upon resolution of the action the parties cannot be returned to the

positions that they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249-50 (2d Cir. 1999).

The harm associated with the disclosure or exploitation of an employer's confidential and trade secret customer information is irreparable.  Indeed, a presumption of irreparable harm arises in cases where a trade secret has been misappropriated.  *See N. Atlantic Instruments, Inc.*, 188 F.3d at 49 (holding that a loss of trade secrets cannot be measured in money damages because a trade secret "once lost is, of course, lost forever") (citation and quotations omitted); *Devos, Ltd.*, 2015 WL 9593616, at *9 ("a presumption of irreparable harm often arises in cases where a 'trade secret' has been misappropriated"); *Lumex*, 919 F. Supp. at 628 ("It is clear that irreparable harm is presumed where a trade secret has been misappropriated."); *Ecolab*, 753 F. Supp. at 1110 ("The use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage constitute irreparable harm."); *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 205-06 (N.D.N.Y. 2011) (same); *Misys Int'l Banking Sys., Inc. v. TwoFour Sys., LLC*, 6 Misc. 3d 1004(A), at *13 (Sup. Ct. N.Y. Cnty. 2004) ("[t]he absence of proof that . . . there has been actual disclosure, is not sufficient to deny injunctive relief under circumstances where it is obvious, as here, that the second employer's work is sufficiently similar to that of the first employer to make likely the risk of disclosure by the employ[e] in the course of [her] subsequent employment.").

The loss of customer goodwill and business relationships also constitutes irreparable harm that cannot be properly redressed by money damages.  *See Ticor Title Ins.*, 173 F.3d at 69 (noting it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."); *Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 401 (W.D.N.Y.

2014) (Wolford, J.); *Ayco Co., L.P.*, 795 F. Supp. 2d at 205 ("absent injunctive relief, Plaintiff is threatened with the imminent, irretrievable disclosure to competitors of confidential information, developed over years through significant effort and expense, and with the loss of the goodwill and trust of its client base"); *Devos, Ltd.*, 2015 WL 9593616, at *10 ("Defendants' admittedly competitive conduct is likely to cause imminent harm to the Plaintiff's customer relationship in a manner that will elude a straightforward dollars-and-cents calculation").

Sexton's actions in violating and interfering with Ivoclar's contractual rights, and in misappropriating Ivoclar's confidential information, creates immediate and irreparable harm to Ivoclar, for which it has no adequate remedies at law.  *See* Stack Aff. ¶¶ 16-18, 21, 26. Absent immediate injunctive relief, Sexton can continue to reap the benefits of her misconduct pending the determination of this case.

## IV.     The Balancing of Hardships Weighs Decidedly in Ivoclar's Favor

The balancing of hardships clearly weighs in Ivoclar's favor.  *Devos, Ltd.*, 2015 WL 9593616, at *17; *W.T. Grant Co. v. Srogi*, 52 N.Y.2d 496, 517 (1981); *Marcone*, 85 A.D.3d at 1697.  Ivoclar has spent years, and invested significant resources, in order to build its business, reputation, and customer relationships.  *See* Stack Aff. ¶¶ 2, 3, 13-18.   Sexton's contacts with the dental community, on the other hand, were all developed through, and at the sole investment of, Ivoclar.  *See id.* ¶¶ 10, 12-18; Evans Aff., ¶ 4.  Absent a preliminary injunction, Ivoclar will bear all of the harm, and risk of further harm, while Sexton, and her current employer Argen, obtain unjustified and unearned economic benefits.  Sexton could also further exploit Ivoclar's confidential information while the case is pending.

**V.    The Court Should Enjoin Sexton from Soliciting and Serving
Her Former Ivoclar Customers Due to Her Misappropriation
and Loyalty Breaches, Irrespective of the Restrictive Covenant**

Even in the absence of a restrictive covenant, courts in New York frequently grant

injunctive relief prohibiting a former employee from soliciting clients where the employee

misappropriated confidential information or violated a common law duty owed to a former

employer.  *See, e.g.*, *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1047-48 (S.D.N.Y.

1987) (enjoining defendant from soliciting certain plaintiff accounts: "In the end, it is not crucial

whether the contract is saved by blue-penciling because [defendant's] breaches of her fiduciary

duties in deliberate theft of [plaintiff's] trade secrets are sufficiently clear and serious to warrant

enjoining her even if there were no covenant not to compete."); *Town & Country House & Home

Serv. v. Newbery*, 3 N.Y.2d 554, 560 (1958) (enjoining former employees from soliciting

plaintiff's customers in unfair competition action where customers had been screened at

considerable effort and expense); *Juniper Entm't, Inc. v. Calderhead*, 2007 WL 9723385 at *26,

*40 (E.D.N.Y. Aug. 17, 2007) (sufficient evidence of misappropriation warranted enjoining

defendant from soliciting former employer's clients); *Inflight Newspapers, Inc. v. Magazines In-

Flight, LLC*, 990 F. Supp. 119, 137 (E.D.N.Y. 1997) ("An employee's use of an employer's trade

secrets or confidential customer information can be enjoined even in the absence of a restrictive

covenant when such conduct violates a fiduciary duty owed . . . to his former employer.").

Indeed, "[i]f there has been a physical taking or studied copying, the court may, in a proper case

enjoin solicitation . . . as an egregious breach of trust and confidence while in plaintiffs' service."

*Leo Silfen, Inc.*, 29 N.Y.2d at 391-92.

Injunctive relief is also available under DTSA "to prevent any actual or threatened

misappropriation . . . on such terms as the court deems reasonable." 18 U.S.C. § 1836(b)(3)(A).

A court may place conditioning restrictions on a defendant's employment, separate and apart

from any employment agreement, in order to prevent misappropriation. *Capstone Logistics Holdings, Inc.*, 2018 WL 6786338, at *30 ("[s]eparate and apart from Defendants' agreements, under the DTSA, courts may grant an injunction to prevent actual or threatened misappropriation, and conditioning restrictions on employment accordingly . . . ."); *W.W. Williams Co. LLC v. Reza*, 2017 WL 5068522 (D. Nev. Sept. 20, 2017) (enjoining defendants from soliciting plaintiff's customers and employees under DTSA).

Sexton stole Ivoclar's trade secret and confidential information in the days and weeks leading up to her resignation from Ivoclar and her commencement of employment with Argen. Now working for Argen, Ivoclar's direct competitor, Sexton is servicing and calling on the very same customers she worked with on behalf of Ivoclar. Based on Sexton's egregious breaches of her fiduciary duties owed to Ivoclar and other violations of the law, the Court should to enjoin Sexton—irrespective of her employment agreement—from soliciting the customers she serviced on behalf of Ivoclar. Such relief is appropriate and necessary in this case.

## CONCLUSION

For the reasons explained above, and in the accompanying affidavits, the Court should grant Ivoclar's motion for a preliminary injunction.

Dated: April 10, 2019

**HODGSON RUSS LLP**

By  s/Rob Fluskey
            Rob Fluskey
            Melissa N. Subjeck
            Sarah N. Miller
The Guaranty Building
140 Pearl Street
Buffalo, New York  14202
Telephone:  (716) 856-4000