STATE OF NEW YORK
SUPREME COURT  :  COUNTY OF ERIE

IVOCLAR VIVADENT, INC.,

Plaintiff,

v.                                                                    Index No. 803302/2019

EMILY SEXTON and
THE ARGEN CORPORATION, INC.

Defendants.

## AFFIDAVIT OF KIM EVANS IN SUPPORT OF IVOCLAR'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

STATE OF NEW YORK      )
                                              ss:
COUNTY OF ERIE            )

      **KIM EVANS**, being duly sworn, deposes and says:

      1.     I am the Vice President of Human Resources for Ivoclar Vivadent, Inc. ("Ivoclar").  I submit this affidavit based on my personal knowledge and my review of Ivoclar business records.

      2.     Ivoclar is a leading developer, manufacturer, and supplier of innovative products and systems for the dental industry.  The company is based in Amherst, New York.  The company has operated out of its Amherst facility for thirty years.

      3.     I have been employed by Ivoclar since 1989.  I have served as Ivoclar's Vice President of Human Resources since January 2, 2018.  During that period, I have been responsible for, among other things, administering Ivoclar's personnel policies and managing the onboarding procedures for new employees.

I.       **Ms. Sexton's Employment with Ivoclar**

      A.       **Ms. Sexton's Hiring and the Agreement**

      4.       Emily Sexton (nee Emily Brown) began her employment with Ivoclar on May 25, 2005 as a Marketing Associate for Ivoclar's Technical Products line.  Ms. Sexton interviewed for this position at Ivoclar's U.S. headquarters in Amherst, New York.  Ms. Sexton lived in Amherst when she interviewed for and accepted the position.  Before joining Ivoclar, Ms. Sexton had no marketing or sales experience in the dental industry.

      5.       In consideration of her employment with Ivoclar, and as a condition to her employment, Ms. Sexton signed a Memorandum of Agreement (the "Agreement"), which is attached as **Exhibit 1**.  I witnessed Ms. Sexton sign the Agreement.  *See* Ex. 1 at signature page.

      6.       Under the Agreement, Ms. Sexton promised to maintain the confidentiality of Ivoclar information and documents, including but not limited to, documents relating to customer lists, company procedures, business activities, and the results of company operations.  *See, e.g.*, Ex. 1 at ¶¶ 3-4.  Ms. Sexton agreed not to use or disclose any confidential Ivoclar information after her employment ended.  *Id.* at ¶ 4.  Ms. Sexton also agreed to a post-employment restrictive covenant.  *Id.* at ¶ 5.

      7.       Ivoclar's procedure is to inform potential employees, before they accepted a position with Ivoclar, that they will be required to sign an agreement that governs the use of Ivoclar information and the employee's post-employment conduct.  Ms. Sexton was given ample time to review the Agreement, including time to consult with counsel, if she chose to do so.  Ms. Sexton expressed no objections to the Agreement when signed it.

- 2 -

**B.**     **Ms. Sexton's Work History**

8.     Ms. Sexton worked for Ivoclar from May 25, 2005 through January 31, 2019.  She held various marketing/sales positions with the company during that period.

9.     Ms. Sexton worked out of Ivoclar's Amherst offices as a Marketing Associate from May 25, 2005 through January 27, 2008.  Ms. Sexton worked out of Ivoclar's Amherst offices as an Associate Marketing Manager from January 28, 2008 through November 1, 2008.

10.     In or around the fall of 2008, there were conversations between Ivoclar and Ms. Sexton about her interest in applying for sales positions.

11.     In November 2008, Ms. Sexton accepted a position as a Field Account Manager for the Ivoclar sales territory that encompassed Minnesota, North Dakota, South Dakota, Nebraska, Iowa, and the western portion of Wisconsin, and Ms. Sexton moved to Minnesota.  She worked as a Field Account Manager from November 2, 2008 through January 1, 2016, and then as a Territory Sales Manager (also a sales representative position) from January 1, 2016 through January 31, 2019.

12.     From November 2, 2008 through January 31, 2019, Ms. Sexton worked for Ivoclar primarily out of her home office in Minnesota.  She traveled frequently to Ivoclar's Amherst offices for meetings and trainings.  Prior to her resignation, she reported to a supervisor who worked out of Ivoclar's Amherst offices.

**C.**     **Ivoclar's Employee Handbook and Related Policies**

13.     Ivoclar employees are bound by the provisions of Ivoclar's Employee Handbook.  Relevant pages of Ivoclar's Employee Handbook, which became effective in 2011 (the "Handbook"), are attached as **Exhibit 2**.  Ms. Sexton agreed to be bound by the provisions

- 3 -

of the Handbook.  *See* **Exhibit 3** (Ms. Sexton's signed Verification of Receipt of Personnel

Policies).

        14.      Under Section 5.4 of the Handbook, Ms. Sexton agreed to safeguard

Ivoclar's business secrets, trade secrets, and confidential information.  *See* Ex. 3 at p. 25.  Under

the Electronic and Telephone Communications/Computer Use Policy of the Handbook (*id.* at pp.

36-39), Ms. Sexton agreed that information contained within Ivoclar's files is confidential and

that such information may not be copied or transferred to another computer, network, or server

without authorization.  *Id.* at p. 36.

## II.    <u>Ms. Sexton's Resignation and Misappropriation</u>

        15.      On January 25, 2019, Ms. Sexton resigned from Ivoclar.  She told me that

she had accepted a position with The Argen Corporation ("Argen"), a direct competitor of

Ivoclar.  I reminded Ms. Sexton of her obligations under the Agreement, and particularly her

confidentiality obligations and her post-employment restrictive covenant.  Ms. Sexton had no

response to my admonitions about her post-employment restrictive covenant obligations under

the Agreement.

        16.      Ms. Sexton's last day of employment was January 31, 2019.  Prior to her

departure, I requested that Ms. Sexton return, among other things, all Ivoclar confidential

information and property in her possession.  Ms. Sexton returned her phone, company-issued

laptop, employee badge, inventory, training materials, and literature.

        17.      But then three weeks later, Ms. Sexton informed Ivoclar that she had

sixteen boxes of Ivoclar materials in her garage, and asked that Ivoclar make arrangements for

their return.

- 4 -

18. After Ms. Sexton's departure, Ivoclar became concerned that Ms. Sexton may have violated company policy and misappropriated company information, particularly in light of her three-week delay in informing Ivoclar about the sixteen boxes of Ivoclar materials in her garage.

19. Accordingly, Ivoclar initiated an internal investigation, which still continues. As part of its investigation, Ivoclar conduct searches on Ms. Sexton's Ivoclar email account. Those searches are still underway, but Ivoclar recently uncovered troubling information.

20. On January 25, 2019, the very same day that she resigned, and after she had accepted employment with Argen, Ms. Sexton forwarded reports to her personal e-mail account. These reports contained proprietary data and specific intelligence on Ivoclar's customers within her territory and were pulled from Ivoclar's customer relations management system (SAP), which contains business, marketing, sales and customer intelligence on Ivoclar's customers in Ms. Sexton's territory and throughout the country. These reports show Ivoclar's sales within Ms. Sexton's territory, broken down by product category. They include confidential and proprietary Ivoclar information and insight on growth potential for her territory, as well as customer-specific intelligence that can be used to target Ivoclar's customers. Ms. Sexton never mentioned these reports or emails in any of the discussions that took place regarding her resignation and her obligation to return company information.

21. Ivoclar's representatives have repeatedly asked Ms. Sexton to return all of Ivoclar's data and documents, including the SAP reports that she forwarded to her personal email account, but Ms. Sexton has ignored Ivoclar's requests.

22.    Sexton is currently working for Argen in a sales capacity, marketing and selling competitive products, in the same or similar territory as that assigned to her while she was employed by Ivoclar.


Kim Evans

Sworn to before me this 19th
_____ day of March 2019

Notary Public

MICHELE M.
NOTARY PUBLIC, STA
QUALIFIED IN NIAGA
My Commission Expires:

MICHELE M. GOLDING
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NIAGARA COUNTY
My Commission Expires: 6/19/19

- 6 -