STATE OF NEW YORK
SUPREME COURT  :  COUNTY OF ERIE

---

IVOCLAR VIVADENT, INC.

                                         Plaintiff,                      Index No. 803302/2019

        v.

EMILY SEXTON and
THE ARGEN CORPORATION, INC.

                                         Defendants.

---

**AFFIDAVIT OF JOHN STACK IN SUPPORT OF IVOCLAR'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

STATE OF NEW YORK   )
                               : ss.
COUNTY OF ERIE        )

        **JOHN STACK**, being duly sworn and under penalty of perjury, deposes and says:

        1.    I am Vice President of Dealer Sales and Specialty Markets for Ivoclar Vivadent, Inc. ("Ivoclar"). I submit this affidavit based on my personal knowledge and my review of Ivoclar business records.

        2.    Ivoclar is a leading developer, manufacturer, and supplier of a comprehensive portfolio of innovative products and systems for the dental industry. Ivoclar maintains an extensive research and development team that is committed to continuously developing innovating products and systems.

3. In addition to research and development, Ivoclar markets, sells, and distributes its dental products worldwide. Ivoclar is dedicated to delivering a total quality experience that consistently meets or exceeds its customers' expectations.

4. I began working for Ivoclar in August 2001. Since that time, I have held the positions of Marketing Manager (from August 2001 to April 2003); National Accounts Manager, Clinical Products (from April 2003 to March 2006); Regional Sales Manager – East, Clinical Products (from March 2006 to January 2011); Director of National Accounts (from January 2011 to August 2016); Vice President of Technical Sales and National Accounts (from August 2016 to February 2019); and Vice President of Dealer Sales and Specialty Markets (from February 2019 to present).

5. I work out of Ivoclar's New York office, located at 175 Pineview Drive, Amherst, New York 14228.

6. In my current role as Vice President of Dealer Sales and Specialty Markets, I am responsible for Clinical Dealer Management, business contracts and all Special Markets participation. I supervise five Ivoclar Vivadent employees, two Sales Directors, one National Account Manager and two Associate Managers.

7. I have extensive knowledge of Ivoclar's clinical dental product and laboratory dental product portfolios. I am knowledgeable of the dental product industry in general, as well as Ivoclar's sales and marketing efforts and its customer base.

8. I directly supervised Emily Sexton ("Sexton") between July 30, 2017 and and January 31, 2019, when she resigned from Ivoclar. As Ms. Sexton's supervisor, I oversaw and managed her work for Ivoclar.

9. Ms. Sexton began her employment with Ivoclar in 2005 at the company's U.S. headquarters in Amherst, New York as a marketing associate. She was promoted to the position of Field Account Manager in November 2008 and moved to Minnesota. Her job title changed from Field Account Manager to Territory Sales Manager in January 2016, but her responsibilities remained exactly the same. At the time that she resigned from Ivoclar, Ms. Sexton was a seasoned sales representative, with responsibilities over a significant sales territory for Ivoclar.

10. As a Territory Sales Manager and Field Account Manager for Ivoclar, Ms. Sexton was responsible for servicing existing Ivoclar customers, and generating new Ivoclar customers within her designated sales territory; which encompassed Minnesota, North Dakota, South Dakota, Nebraska, Iowa, and the western portion of Wisconsin. Ms. Sexton was specifically responsible for generating sales of Ivoclar's Laboratory Product Portfolio. Ivoclar's Laboratory Product Portfolio includes its ceramics products, alloy products, CAD/CAM accessories, furnaces, harvest products, digital products, metal ceramic products, removable prosthetics, resins, denture teeth, and temporary materials.

11. Because her designated sales territory spanned several states, Ms. Sexton conducted a significant portion of her job responsibilities, including servicing existing Ivoclar customers and generating new Ivoclar customers, by email and telephone.

12. During the time I supervised Ms. Sexton, she and I communicated regularly or as needed, about Ivoclar customers and other sales and business related matters. In addition, at times, Ms. Sexton traveled to Ivoclar's Amherst, New York office in order to attend Ivoclar meetings, training programs, and other Ivoclar-sponsored functions. All products sold to Ms. Sexton's customers were processed and shipped from Ivoclar's New York location.

13. Because the dental products industry is highly competitive, Ivoclar's client relationships are critical to its business. Ivoclar expends significant resources to develop, maintain, and expand its customer relationships. Ivoclar also expends significant time and resources to extensively train and educate its sales force, who are the front line for Ivoclar. Ivoclar's sales force is instrumental to its success.

14. As Ms. Sexton's responsibilities increased, from an entry-level employee in Ivoclar's marketing department to a Territory Sales Manager, she received extensive training on Ivoclar's dental product portfolios, Ivoclar's marketing and sales strategies, and received real-time data on Ivoclar's customers.

15. Subject to her confidentiality obligations, Ivoclar trained Ms. Sexton on Ivoclar's dental product lines, the inner workings of Ivoclar's marketing and sales strategy, and its customer base. Ms. Sexton was intimately familiar with Ivoclar's customer base within her sales territory. In addition, Ms. Sexton had full access to all of Ivoclar's customer-specific information for customers within her territory.

16. Ms. Sexton possessed confidential Ivoclar business information relating to product research, development, business activities and procedures, sales strategies, pricing information, customer lists and contacts, customer sales histories, target customers, services and

suppliers, and information developed and prepared specifically for individual Ivoclar customers to whom she was assigned.

17. Ivoclar provided Ms. Sexton access to its customer relations management software (SAP) system; which contains extensive business, marketing, sales, and customer intelligence information. Ivoclar's SAP system contains specific sales history and information for every Ivoclar customer.

18. Ivoclar's SAP system can be used to generate customer-specific reports that contain detailed information such as the customer's purchased products, purchased quantities, total sales, sales contribution margins and customer-specific pricing. All of this intelligence is highly valuable, confidential, and proprietary to Ivoclar.

19. Access to Ivoclar's SAP System is restricted based on position and responsibilities in the company, and requires credentials like a username and password.

20. On January 25, 2019, Ms. Sexton provided Ivoclar with notice of her resignation. She told Ivoclar that she had accepted a position with The Argen Corporation ("Argen"), a direct competitor of Ivoclar with a presence in the upper Midwest.

21. Prior to her notice of resignation, Ms. Sexton accessed Ivoclar's SAP system and generated several reports that contain specific intelligence on Ivoclar's customers within her territory. On that very same day she resigned, Ms. Sexton forwarded these SAP reports to her personal e-mail account. These reports show Ivoclar's sales within Ms. Sexton's territory, broken down by product category. They provide highly valuable, confidential, and

proprietary Ivoclar information and insight on growth potential for her territory, as well as customer-specific intelligence that can be used to specifically target Ivoclar's customers.

22. I understand that Ms. Sexton is currently employed by Argen.

23. I am familiar with Argen, it is a direct competitor of Ivoclar. Argen manufactures and sells dental products, including dental alloy, zirconia, abutment and implant parts, supplies, digital products, and equipment. Argen's dental zirconia, zirconia shading liquids, and dental alloy products compete directly with Ivoclar's dental zirconia, zirconia shading liquids and alloy product portfolio.

24. Argen markets itself as a leading manufacturer of dental products worldwide. Argen advertises, markets, and sells its products globally, including within New York.

25. During her time at Ivoclar, Ms. Sexton was responsible for marketing and selling Ivoclar's alloy products to customers located in her territory. She was fully familiar with Ivoclar's pricing, sales strategies and product details relating to Ivoclar's alloy products.

26. Disclosure of Ivoclar's customer-specific intelligence and other confidential Ivoclar information to Argen would provide an extraordinary, unfair advantage to Argen. Argen could utilize Ivoclar's confidential information to solicit and acquire Ivoclar customers. For example, if Argen gained access to Ivoclar's confidential information, including the reports generated by Ms. Sexton on the day of her resignation, it could use this information to target and solicit Ivoclar's customers, undercut Ivoclar's pricing proposals, and determine Ivoclar's effective bundling strategies that are based on longstanding customer-specific data.

27. Ms. Sexton was permitted access to Ivoclar's confidential information for purposes of servicing Ivoclar customers only. This is made clear to all employees at the time of hire, and throughout their employment at Ivoclar, including in their respective employment agreements and employee handbook.

28. Sexton is currently working for Argen in a sales capacity, marketing and selling competitive products, in the same or similar territory as that assigned to her while she was employed by Ivoclar.

DATED:   March 19, 2019

_____
John Stack

Sworn to before me this
19th day of March, 2019

_____
Notary Public

MICHELE M. GOLDING
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NIAGARA COUNTY
My Commission Expires: 6/19/19

15031098v1